UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CFN AGENCY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 12-12091-LTS |
| ) | |
| LIBERTY MUTUAL INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**CFN AGENCY, INC.'S OPPOSITION TO LIBERTY MUTUAL'S
MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CFN'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Sean T. Carnathan (BBO# 636889)
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli (BBO# 666128)
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
Tel. (781) 359-9000

*Counsel for Plaintiff CFN Agency, Inc.*

## INTRODUCTION

After nearly 10 years in business together, Defendant Liberty Mutual Insurance Company ("Liberty") proposed, and Plaintiff CFN Agency, Inc. ("CFN") agreed, to revise the list of groups for which CFN would be paid commission upon a sale or renewal of a Liberty home or automobile insurance policy. Liberty knew – and expressly acknowledged in the contract – that many of CFN's groups were considered "inactive" and would remain so throughout the course of their relationship. Nonetheless, in accordance with industry practice and their historical relationship, the parties agreed that CFN would continue to remain the "representative of record" for each of those groups until such time as the group terminated CFN or replaced it with a different broker. The parties did, however, build in an exit strategy for Liberty. If Liberty wanted to terminate its commission obligations, it could do so *but only if* Liberty purchased CFN's right to commissions in accordance with a contractually-specified formula.

As 2011 drew near, Liberty claims to have been unhappy with the activity level generated by CFN's groups, even though these groups generated nearly $23 million in annual revenue for Liberty (for which Liberty paid CFN a paltry $400,000). Liberty wanted to terminate CFN's relationships with its groups so that it could pursue those groups directly and hopefully turn the $23 million business into something even larger. Liberty, however, faced a quandary. To pursue the groups directly, it needed to terminate CFN's relationship, but could not do so because the contractual buyout was at odds with its admitted need to preserve cash. So, it hatched a plan. Knowing of the inactive relationships that CFN had with its groups, Liberty fabricated a contractual provision – that is nowhere to be found in the contract – that purportedly authorized it to demand (apparently for the first time in its corporate history) that CFN submit proof that it remained the representative of record for nearly each one of its 100 or so groups.

When CFN refused to comply with Liberty's baseless demand, Liberty ceased paying CFN and achieved its goal of realizing $385,000 in annual savings that it no longer had to pay in commissions, all while continuing to receive at least *$38 million* in revenue each year from CFN's relationships, which Liberty never would have received if not for CFN. To add insult to injury, Liberty then retaliated against CFN for challenging Liberty's decision by refusing to restore CFN's access to Liberty's real-time quoting system.

Based on the facts developed during discovery, there is no legal basis to enter summary judgment in Liberty's favor. Liberty's entire argument boils down to a claim that it is entitled to judgment as a matter of law based purportedly on a contractual right that is not expressly set forth in the contract. To find for Liberty, this court would necessarily have to delve into (and then completely ignore) the parties' course of dealing and relevant industry practice to somehow find that Liberty had an implied contractual right to demand CFN's "proof." Only a jury can make this determination.

CFN, on the other hand, is entitled to judgment as a matter of law. Because Liberty did not have the right to demand CFN "re-prove" its status as representative of record – either by the unambiguous terms of the contract or by interpreting the contract in accordance with their historical practice – Liberty breached its contract by failing to pay CFN the compensation it owed, and then further breached its contract by failing to restore CFN's real-time quoting capabilities. CFN is, therefore, entitled to summary judgment on Count I of its Amended Complaint.

# FACTS

## CFN's Business And The Voluntary Benefits Industry

CFN is in the business of making certain voluntary benefits available to the individuals employed by or associated with large companies and affinity groups, such as trade and alumni associations. *Statement of Facts ("SOF")*[1], ¶ 1.  One benefit that CFN offers is access to discounted homeowners and automobile insurance products procured through a variety of large insurance carriers, such as Travelers, Met, and Liberty. *Id.*  CFN makes these offerings available to the individuals through a variety of means, including a website called YouDecide.com, corporate intranet sites, and a supporting telephone call center. *Id.*, ¶ 4.  As it relates to insurance products, CFN is paid a commission only when an individual purchases or renews a policy from the carrier. *Id.*  The purpose of establishing a relationship with a broker such as CFN is to gain access to clients Liberty otherwise would not have access to. *Id.*, ¶ 128.

The voluntary benefits industry is unique.  Unlike "core" benefits (such as health insurance), where employers either pay for or help subsidize the cost of the benefit, voluntary benefits are paid for solely by the employee. *Id.*, ¶ 3.  As a result, voluntary benefits typically take a "backseat" to the priorities and attention required of the core benefits. *Id.*, ¶ 118.  It is not uncommon for employers to either leave the current voluntary benefits package unchanged for years and/or to simply ignore multiple communications from their brokers. *Id.*  This is particularly true where there has been personnel turnover in the benefits department. *Id.*  These types of clients are often referred to as "inactive" or "dormant" clients. *Id.*, ¶ 119.

In the voluntary benefits industry, a broker can initially obtain its authority to represent a client in one of several ways. *Id.*, ¶ 120.  It can be appointed as the client's "broker of record"

---

[1]     All references to the paragraphs in the Statement of Facts refer to the entire enumerated paragraph, including CFN's Responses to Liberty's asserted facts.

either through what is referred to as a "broker of record letter" or through the authority granted in a verbal or written contract. *Id.* Once a broker is established as the client's broker of record, a client will not typically execute contract or another broker of record letter unless it hires a replacement broker.[2] *Id.*, ¶ 121.

There are only two recognized ways in which a broker can lose its status as a client's representative in this industry: it can either be terminated by the client or it can be supplanted by a new broker. *Id.*, ¶ 122. Absent an express contractual provision to the contrary, a broker cannot lose its status simply due to inactivity. *Id.*, ¶ 123. As Melanie Foley, the former head of Liberty's Affinity Marketing Department explained, "No longer active does not mean a legitimate relationship does not exist . . .. There's no marketing activities going on at the time but that they are still considered agent of record." *Id.*, ¶ 124. Similarly, Mark Parabicoli, the former Managing Director of the Affinity Department, admits that "[t]he fact that a contract still exists" demonstrates that a broker and client remain in a relationship even if new personnel in those companies are "not aware of" the contracts. *Id.*, ¶ 125.

### CFN's Historical Relationship With Liberty

CFN and Liberty first entered into a contract in 1997. *Id.*, ¶¶ 5, 17. At the time, and for many years after, CFN's Internet-based platform was a unique distribution model for Liberty that no other broker provided. *Id.*, ¶ 126. The 1997 contract did not, as Liberty contends, allow CFN to quote and bind Liberty's policies. *Id.*, ¶ 17. Instead, it provided that CFN, as an "information technology services medium," would provide its customers with access to Liberty by which Liberty could provide the price quotations and, if accepted, bind the policies. *Id.* The contract

---

[2]     Liberty admits that it typically receives this supplanting broker of record letter either directly from the insured or from the new broker. *Id.*, ¶ 121 n.1. This is in keeping with industry practice. *Id.*

specifically appointed CFN as the "representative of record" for all contracts developed or initiated through its program. *Id.*, ¶ 127.

Throughout the years, CFN entered into agreements with various groups whereby CFN would be permitted to offer its program to the entity's employees or members, including the auto and home products offered by Liberty. *Id.*, ¶ 129. When Liberty sold or renewed a policy for an employee or member of one of CFN's groups, it paid CFN a commission, regardless of whether that policy was directly attributable to "CFN's efforts." *Id.*, ¶¶ 4, 32-33, 130.

In 2002, Liberty and CFN signed a new contract (the "2002 Contract"). *Id.*, ¶ 18. Liberty once again appointed CFN as a representative for its clients in order to perform the duties required by the 2002 Contract, but this time referred to CFN as a "non-exclusive General Agent of Record." *Id.*, ¶ 131. CFN still had no authority to quote or bind any of Liberty's policies, but was required to solicit applications for those employees who were members of its program at the time and for any members of affinity groups that may enter into contracts with CFN from time to time. *Id.*, ¶ 132.

In 2004, CFN came under new ownership. *Id.*, ¶ 20. As part of the initial communications with CFN, Liberty expressed a concern about the activity levels generated by CFN's clients. *Id.*, ¶ 133. CFN's new ownership, led at the time by President and CEO Salvatore Percia, confirmed to Liberty almost immediately that a number of CFN's relationships with its clients were "no longer active" and that CFN would be willing to allow Liberty to buyout the right to its renewal commissions. *Id.*, ¶ 134. CFN even specifically informed Liberty that, for some clients, the relationship was dormant and consisted of nothing more than a contract and a website. *Id.*, ¶ 135. Nonetheless, Liberty was not concerned and continued to pay CFN

the commissions it was owed under the 2002 Contract for any policies sold or renewed for any of its clients, including the "inactive" ones. *Id.*, ¶ 136.

In 2006, Liberty suddenly stopped issuing codes[3] for CFN's new business. *Id.*, ¶ 137. When CFN inquired about this to Liberty, Liberty's Christopher Capone informed Mr. Percia that he wanted CFN to sign a new contract in order for the parties to "work together more closely" to increase CFN's production for certain clients and to "modernize" the contract and bring it more in line with Liberty's standardized forms with other brokers. *Id.*, ¶ 138. As part of this process, Liberty and CFN negotiated a buy-out of certain of CFN's clients. *Id.*, ¶ 139. Specifically, Liberty and CFN agreed upon a number of clients who had been "terminated" for which Liberty agreed to pay $84,047.00 for the right to remove these clients from its commission obligations and to allow Liberty to market directly to them. *Id.*, ¶ 140. They also agreed on a number of clients who, although would remain as part of the upcoming 2007 contract, would be marketed to only "inactively," meaning that Liberty's products would be offered on the website but that CFN would not engage in any affirmative marketing of Liberty's products. *Id.*, ¶ 141. Liberty paid CFN $175,986.00 to terminate any existing commission obligations it owed for these "inactive" clients under the 2002 Contract, and otherwise agreed to "re-set the broker of record date" for these inactive groups under the 2007 Agreement. *Id.*, ¶ 142.

### The 2007 Agreement

The 2007 Agreement (signed three days after the buyout agreement) took effect on January 1, 2007. *Id.*, ¶ 143. After reconciling CFN's clients with those that the parties had agreed would be terminated as part of the buyout, Liberty proposed and CFN agreed to a list of clients for which the parties agreed that CFN had been designated as the representative of record.

---

[3]       These codes are used to track what policies should be attributable to which group.

*Id.,* ¶ 144.  Many of these groups were the very same ones that the parties agreed would be

marketed to only inactively (only a website) as part of the buyout, and others were the very same

groups that CFN had informed Liberty were inactive as early as September 2004.  *Id.,* ¶ 145.

Like the previous contracts, CFN was paid a commission for any policy sold or renewed

to one of the specified group's employees or members, unless the policy was (i) sold to that

employee prior to its group establishing a relationship with CFN; (ii) sold to an employee of one

of the "inactive" groups prior to January 1, 2007; or (iii) derived from the sale of other Liberty

products not offered by CFN.  *Id.,* ¶ 146.  Otherwise, the commission was owed if CFN

"continued [to be] designat[ed] as a representative record" for the group.  *Id.,* ¶ 25.  The

Agreement did not specify how or under what circumstances CFN would no longer "continue [to

be] designat[ed] as a representative of record," nor did the parties discuss it during the contract

negotiations.  *Id.,* ¶ 147.  The Agreement also does not contain any provision purportedly

requiring CFN to "re-prove" its designation once the group has been established as part of the

program.  *Id.,* ¶ 148.

The 2007 Agreement did, however, specify how Liberty could remove itself from CFN's

program.  In particular, Section 6(b) specified that Liberty could "remove" any group from the

program for certain enumerated reasons, including the "termination of CFN's designation by

Group to represent Group hereunder."  *Id.,* ¶ 149.  Liberty could also unilaterally elect to remove

a group from the program, but if it did so for any reason other than those enumerated reasons,

Liberty had to pay CFN.  *Id.,* ¶ 150.  It could (i) pay CFN renewal commissions for a period of

10 years or as long as a policy continues to renew with Liberty, whichever was shorter; or (ii)

pay CFN a single lump sum representing 3.5 times the removed group's annualized renewal

commissions. *Id.* As Mr. Capone confirmed during the negotiations, this buyout provision was intended to protect CFN from Liberty's arbitrary cancellation of any group. *Id.*, ¶ 151.

The 2007 Agreement also addressed CFN's "real-time quoting" capabilities. Since at least 1998, Liberty had provided CFN with the technological ability to provide its clients with access to "real-time" quotes. *Id.*, ¶¶ 152-153. CFN would transmit its client's application information to Liberty electronically, and Liberty would send an electronic quote back to CFN within minutes, which CFN could then provide to the potential applicant. *Id.* This system is referenced in Section 5(a)(iv) of the 2007 Agreement, which states that CFN "shall transmit data to Liberty via insurance applications for Members." *Id.*, ¶ 154. Liberty acknowledges that this section describes CFN's real-time quoting system, admits that CFN was the only broker to have access to this system in 2006-2007, and specifically identifies this section as one of a handful of "customized" provisions that differ from Liberty's standard broker agreement. *Id.*, ¶ 155.

### Liberty's Efforts To Sabotage CFN's Business

Between 2007 and 2011, CFN did what it had done for years. It established new clients, attempted to reinvigorate the relationship with some of the inactive clients, and otherwise supported its program by making modifications and upgrades to the client's customized website and, in many cases, communicating with its clients' benefits department or employees. *Id.*, ¶ 156. Like any broker, a few select clients terminated its relationship with CFN during this time. *Id.*, ¶ 16. A few others made changes to the existing relationship, such as asking for certain logos to be removed from the website or to limit or decrease the amount of direct communications with the employees. *Id.*, ¶ 157. For the few select clients that terminated its relationship, CFN was unaware of whether the group informed Liberty of its termination decision in accordance with industry practice. *Id.*, ¶ 158. Otherwise, CFN continued to offer

access to Liberty's products and actually achieved a 34% growth in business during this time. *Id.*, ¶ 159.

In 2008, Eli Silberzweig was appointed to lead Liberty's compensation team and was tasked with the duty to "improve the financial performance" of the Affinity's employer segment. *Id.*, ¶ 160.  One of his first tasks was to exercise Liberty's right to buy out CFN's commission stream for Bell South so that Liberty could work directly with it. *Id.*, ¶ 161.  However, beginning later that year, Mr. Silberzweig's team began to focus on ways for Liberty to "preserve cash." *Id.*, ¶ 162.  It rejected CFN's request for a contractual buyout of all of its "passive" accounts, which Liberty considered all but four of CFN's clients to be, as the price of the buyout would exceed $1 million. *Id.*, ¶ 163.  It then ceased paying compensation for several clients whom Liberty represented it had received notification that a new broker had replaced CFN or that the client wanted to work directly with Liberty. *Id.*, ¶ 164.

Meanwhile, in October 2007, Liberty informed CFN that it was going to temporarily shut down CFN's real-time quoting access to allow Liberty to modernize the system. *Id.*, ¶ 165. Liberty represented that the shut down would last approximately 12 months, and that CFN would be provided with a telephone "work around" during this "interim" period as a method to "fill the gap" until the real-time access was restored. *Id.*, ¶ 166.  Liberty admits that it intended to restore CFN's access to the real-time system at the time it was taken down because "it was there before." *Id.*, ¶ 167.

Liberty's modernized system, the so-called "Customers First" platform, was first available in 2009. *Id.*, ¶ 104.  However, rather than restore CFN's access, Mr. Silberzweig decided that he "don't want to give [it to] them." *Id.*, ¶ 105.  Instead, in an internal discussion

with Mr. Parabicoli, Mr. Silberzweig explained that he would be "non-committal" in his response to CFN's requests for real-time quoting to be restored. *Id.*, ¶ 168.

Nonetheless, Liberty continued to make reassuring promises and representations to CFN regarding the restoration of its real-time quoting system. In 2010, Liberty told CFN that it was advocating for the restoration of its real-time quoting system and that it was the Affinity Marketing Department's "top priority" for the 2011 year. *Id.*, ¶¶ 105, 107. In May 2011, Liberty decided that CFN should be first in line to receive the system in 2012 because of the number of clients CFN had and because it already had an online presence. *Id.*, ¶ 169. Three months later, in August 2011, Liberty prioritized CFN's access as a "must have project" for the upcoming year. *Id.*, ¶ 108.

What CFN did not know at the time was that Mr. Parabicoli, the same Liberty person who was allegedly prioritizing CFN's real-time quoting system, was simultaneously meeting with Liberty's in-house counsel to discuss ways in which Liberty could "begin pulling back" the compensation it owed to CFN for the inactive accounts. *Id.*, ¶ 170.

### Liberty's Unprecedented Request for CFN to Re-prove Its Relationships

On October 20, 2011, Liberty took the unprecedented step of unilaterally demanding that CFN provide a written statement from each of its clients that the client currently recognized CFN as its representative of record. *Id.*, ¶¶ 93, 171. Liberty gave CFN sixty days to comply. *Id.*, ¶ 171. **In keeping with industry practice, Liberty had never asked this of CFN at any time during the course of its fourteen-year relationship, nor has Liberty _ever_ made this request to any other of its several hundred brokers unless a client complained or there were competing brokers claiming a right to the same client.** *Id.*, ¶ 172. Before January 29, 2012

(the day Liberty ceased paying commissions), Liberty had never terminated a broker's relationship simply due to inactivity. *Id.*, ¶ 173.

Recognizing that Liberty was attempting to rely on a contractual provision that did not exist, CFN informed Liberty that it would not comply with its demand but that CFN would agree to provide Liberty with the original contracts and current website screenshots proving that CFN continued to offer Liberty's products to each of its clients. *Id.*, ¶ 95. Liberty rejected this request and, on January 29, 2012, ceased paying CFN all of the commission it was owed under the 2007 Agreement. *Id.*, ¶¶ 95, 174. It then "felt free" to begin marketing directly to CFN's "desirable" groups, and has admitted to contacting several of them, and unabashedly representing to at least one that working with CFN was "not comparable" to working directly with Liberty. *Id.*, ¶ 175.

Despite Liberty's conduct, CFN continued to work with Liberty to receive the long-promised real-time quoting access. In February 2012, Liberty provided CFN with the technological specifications so that it could begin building the interface CFN would need to access Liberty's system. *Id.*, ¶ 108. Then, on the eve of this program's supposed development in the spring of 2012, Liberty decided to withhold CFN's access to this system due to the impending litigation. *Id.*

On May 29, 2012, Liberty – despite knowing that litigation was looming – shut off the codes used to track new business being sold to CFN's clients. *Id.*, ¶ 176. The result of this incredible decision is that no one, including Liberty, has any definitive way to determine how much commission CFN will be owed if it prevails in this litigation. *Id.*, ¶ 177. However, less than two weeks after Liberty sent its October 20, 2011 demand to CFN, Liberty estimated that its request would result in $385,000.00 in "annual savings" each year. *Id.*, ¶ 178. This equates to at least $38 million in premium for Liberty each year. *Id.*

Incredibly, even though Liberty cut off CFN's commissions for nearly 75% of its clients,

CFN has helped grow Liberty's book of business by 117% in the last three years. *Id.*, ¶ 181.

## ARGUMENT

Count I of CFN's Amended Complaint asserts that Liberty breached the 2007 Agreement

by: (i) unlawfully withholding CFN's commission payments; and (ii) failing to restore CFN's

real-time quoting capabilities.  CFN seeks summary judgment on both.[4]

## I. CFN IS ENTITLED TO SUMMARY JUDGMENT AS IT RELATES TO THE UNLAWFULLY WITHHELD COMMISSION PAYMENTS.

### A. *The Plain And Unambiguous Terms of the 2007 Agreement Do Not Permit Liberty To Cease Compensation Until CFN "Re-proves" Its Status as Representative of Record.*

When construing the parties' contractual obligations, the Court must look to the four

corners of the contract to determine whether a particular term is unambiguous. *Boston Edison*

*Co. v. Federal Energy Regulatory Com.*, 856 F.2d 361, 365 (1st Cir. 1998); *Sparks v. Microwave*

*Assoc., Inc.*, 359 Mass. 597 (1971).  If it is, the court must enforce the contract according to its

plain terms. *Boston Edison Co.*, 856 F.2d at 365.  If the term is ambiguous, a court can look to

extrinsic evidence, such as the parties' course of dealing and industry practice, to enlighten the

meaning behind the ambiguous provision. *Id.* ("when the written agreement, as applied to the

subject matter, is in some material respect uncertain or equivocal in meaning, [then] 'all the

circumstances of the parties leading to its execution may be shown for the purpose of

elucidating" the contractual provision); *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.*,

416 Mas. 839, 845 (1994) ("[v]alid usages known to contracting parties, respecting the subject

matter of an agreement, are by implication incorporated therein . . . and are admissible to aid in

---

[4]      Although CFN does not affirmatively seek summary judgment as to the remaining counts
in its Amended Complaint, it opposes Liberty's request for summary judgment on each.

its interpretation . . upon the theory that the usage forms a part of the contract"). Ambiguous terms are those that are reasonably susceptible to different, and potentially contradictory, interpretations. *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998). Above all, rules of contract interpretation "must give way to the primary objective that a contract is to be construed to reflect the intention of the parties." *Affiliated FM Ins. Co.*, 416 Mass. at 845.

It is undisputed that CFN is not entitled to commissions under Section 6(d)(iii)(A) of the 2007 Agreement if CFN has lost its designation as "representative of record." However, ***nothing*** in the 2007 Agreement gives Liberty the right to withhold CFN's commissions until it "re-proves" that it remains the representative of record for a group for which the parties had already agreed CFN represented. Although Liberty attempts to skirt the issue in its memorandum, the entire premise of Liberty's position must be that the "right" it claims to rely upon is implicit in the terms of the contract. This court cannot determine whether such an implicit right exists in the absence of extrinsic evidence, such as the parties' course of dealing or industry practice, which Liberty has argued is inappropriate for summary judgment. *LiDonni, Inc. v. Hart*, 355 Mass. 580, 583 (1969) (an implied contractual term "may be found to exist from the conduct and relations of the parties"). However, even if it could consider such an argument in the absence of such evidence, Liberty's position is not supported by the record or relevant law. This was not a situation where two competing brokers claimed a right to commission payments, nor was this a situation where a group or any other third party informed Liberty that it no longer recognized CFN as its representative. Instead, Liberty manufactured and then exercised this phantom contractual right, it says, merely because of "low" activity levels ($23 million worth) generated by the groups.

Perhaps Liberty's position would be supported if there were any contractual obligation for CFN to achieve or maintain an activity level for any of its groups. Such contractual obligations do exist in the industry.[5]   However, there is not a ***single*** reference to activity levels anywhere in the 16 pages that comprise the 2007 Agreement. This should come as no surprise, since Liberty knew as early as 2004 that many of CFN's clients were inactive, and explicitly acknowledged in the December 2006 buyout that many of the groups were to remain inactive for purposes of the 2007 Agreement. Even Ms. Foley – the former head of the entire Affinity Marketing Department – confirmed that legitimate broker/representative relationships exist in the absence of any activity, and that one can remain a representative of record even if it conducts zero marketing to its clients. Liberty's manufactured contractual right simply does not exist under the plain and unambiguous terms of the 2007 Agreement and, as such, CFN is entitled to summary judgment.

> **B.**     *To The Extent The Contract Is Ambiguous, The Parties' Course of Dealing And Relevant Industry Practice Confirm That CFN Remains The Representative Until It Is Supplanted By A New Broker or Terminated By the Client.*

Even if this court were to find that the contract term is ambiguous, the parties' course of dealing and applicable industry practice confirm that CFN remains the representative until one of two things happen: (i) it is replaced by a new broker; or (ii) the client expressly terminates CFN's status.

The voluntary benefits industry is unique. In this industry, a representative remains a representative until it is either replaced by a new one or its status is expressly revoked by the client. This is clear not only in the testimony of the personnel from both CFN and Liberty, but also by the experts proffered by <u>both</u> parties. Liberty's own expert, Mark Cohon, is a self-

---

[5]     Liberty's own expert confirmed that he has personally managed broker contracts that conditioned payments on meeting certain objective communication levels. *SOF*, ¶ 179.

proclaimed voluntary benefits expert who has over twenty years' experience working for one of Liberty's competitors (Met) as well as one of CFN's competitors (ABC). Mr. Cohon admits that during his 9 years working for Met, he was aware of Met asking to verify a broker's relationship only when there was a question about competing brokers. *SOF*, ¶ 180. Similarly, during his decade at ABC, the only time Liberty or its biggest competitor, Met, ever asked ABC to verify its relationship was in the context of potentially competing brokers. *Id.*

Liberty is an insurance giant that has brokerage relationships with hundreds of brokers. One would expect that Liberty would have exercised this purported right to request verification at some point over its decades' long relationships with these hundreds of brokers if it truly believed that it had the right to do so. However, nobody at Liberty has been able to identify any particular instance when it requested this verification from either CFN or any other broker unless, similar to Mr. Cohon's experience, there was a question about competing brokers or if the client itself complained to Liberty.

In fact, Liberty's course of dealing with CFN has been completely the opposite. Liberty knew as early as 2004 that many of CFN's relationships were inactive. It was reminded of this numerous times throughout 2006 when the parties were negotiating the 2007 Agreement, and, most tellingly, in the December 2006 buyout in which Liberty explicitly agreed that many of CFN's groups were going to be considered inactive for purposes of the 2007 Agreement. This course of dealing, which is entirely consistent with industry practice, elucidates the meaning that the parties intended to ascribe to CFN's "continued designation." And yet, when it came to October 2011, Liberty attempted to ignore its own course of dealing (and its own knowledge of CFN's accounts) to take the unprecedented move of ceasing compensation until CFN "re-proved" its status (and saving nearly $400,000 a year in the process).

Liberty's purported concern about not getting enough new business activity from these accounts does not grant it the unilateral right to terminate CFN's representative of record status. In fact, as Mr. Capone admits, Liberty specifically agreed to this contractual protection for CFN by creating the buyout provision contained in Section 6(b). This provision, which Mr. Capone represented was to protect CFN from "arbitrary cancellation," grants Liberty the "out" that it is so desperately looking for in this relationship. It permits Liberty to unilaterally terminate CFN's representative of record status, but <u>only</u> in exchange for an agreed-upon buyout of CFN's renewal stream. By demanding that CFN re-prove its status as representative of record in October 2011, Liberty manufactured a creative mechanism to avoid this buyout obligation while simultaneously realizing $375,000 in annual savings by refusing to pay relatively miniscule commissions on policies that are renewing each year and generating tens of millions of dollars in premium revenues for Liberty. It is clear that Liberty's scheme is not only not permitted by the contract, it is prohibited by the buyout obligation. Accordingly, CFN is entitled to summary judgment for the unlawfully withheld commissions.

C.      *Liberty is Not Entitled To Summary Judgment On The Allegedly Inactive Accounts.*

Liberty is not entitled to summary judgment for all of the reasons why CFN is entitled to summary judgment set forth in Sections "A" and "B", above. However, even if the court does find that CFN must re-prove its relationship to earn commissions, Liberty is not entitled to summary judgment for any of the groups in question.

Based on the inappropriate testimony of its law firm's paralegal, Liberty attempts to classify CFN's clients into the following groups: (i) those without a written contract; (ii) those that were allegedly terminated; (iii) and those that allegedly "do not acknowledge a relationship

with CFN."[6]  With the exception of the 8 groups that CFN acknowledges were terminated and is therefore not seeking commissions[7], each of Liberty's attempted classifications is highly fact-dependent and cannot be resolved without a trial.

As the former head of Liberty's Affinity Marketing Department confirmed, there is no requirement for CFN to have a written contract for it to be recognized as the group's representative of record, nor can one lose representative of record status merely because of inactivity.  Several of the contracts, which CFN's management reviewed as part of its purchase of the platform, are believed to have been lost in the asset purchase that occurred over ten years ago.  Moreover, simply because a group has requested that its logo be removed from CFN's website, or has asked that CFN stop sending emails to its employees, does not necessarily mean that CFN is no longer that group's representative.  The benefits department may just not want to appear to be endorsing one of CFN's product offerings.  It may want to streamline communications about the website only from the benefits department.  There are a myriad of other reasons why a client can make such requests of CFN.

Absent an explicit termination, which there is not for any of the groups outside of the 8 for which CFN is not seeking commissions, the fact that CFN has been communicating with these groups' employees, have maintained and modified the group's particular websites, and have been responsible for arranging for the sale of new policies for over a decade is more than sufficient evidence to present a triable issue as to whether a relationship continues to exist.

This is underscored by Liberty's own argument.  To support its position, Liberty does not rely on the contract – it relies on common law principles of agency to argue that CFN should

---

[6]     CFN does not agree that these are valid classifications.  Even if it did, it disputes where each group falls within these classifications.

[7]     Since CFN does not seek commissions for these groups, there is nothing to enter summary judgment on with respect to these groups as it relates to CFN's affirmative claims.

have known that it no longer represented those groups because the communications, or alleged lack of communications, "should [have] lead [CFN] to believe that [its] authority is restricted or terminated." Even if it was proper to apply common law agency, rather than contractual, principles, what CFN "should" have known or "should have been lead to believe" based on certain communications is inherently a factual matter than cannot be resolved on summary judgment. Liberty is not entitled to summary judgment due to the undeniable presence of these genuine issues of factual dispute.

## II.   LIBERTY BREACHED THE CONTRACT BY FAILING TO RESTORE CFN'S REAL-TIME QUOTING CAPABILITIES.

The court must construe the 2007 Agreement as a whole, including the parties' ongoing relationship, to determine Liberty's obligation to restore CFN's real-time quoting capabilities. The undisputed evidence confirms that Liberty itself understood that it was going to restore these capabilities as part of the 2007 Agreement.

Liberty's own 30(b)(6) representative confirmed that Liberty always intended to restore this system because it had "already been there" when the parties entered into the 2007 Agreement. It provided CFN with a temporary work-around for the "interim" period. And although the system may have taken longer to complete than was originally anticipated, Liberty's own personnel confirmed that this had nothing whatsoever to do with CFN, its business, or its relationship with its clients. To the contrary, restoring CFN's real-time quoting system was the Affinity Marketing Department's top priority for 2011 and, according to Liberty's corporate designee, was recommended to be the first broker to receive the capability. Indeed, Liberty even began the process of building the necessary interface for CFN by providing it with specifications in February 2012 – three months *after* Liberty send the October 2011 verification demand and one month after it ceased paying commissions to CFN. It was only after Liberty realized that

CFN would challenge Liberty's decision to unlawfully withhold its commissions that Liberty decided not to restore CFN's access under the guise that it was not required by the contract.

Section 5(a)(iv) clearly describes the real-time quoting system that was in place when the parties entered into the contract. It required that CFN provide the information needed for Liberty to complete the quote electronically, which allowed Liberty's system to respond within minutes. If Liberty itself did not believe that this system was integral to and part of the parties' contracts, it would not have provided a "fill the gap" solution when it was temporarily removed – it would have just turned off the system. Nor would Liberty have made the system a top priority at the same time it was planning to cease commissions out of an alleged concern for lack of business. Liberty's own conduct confirms that the parties' themselves understood that CFN was required to have access to this system as part of its contract, despite the parties' failure to unambiguously state so in the contract itself. Based upon the undisputed facts, CFN is entitled to summary judgment. At the very least, these undisputed facts require a jury to determine whether CFN's access to real-time quoting was implicitly required as part of the contract.

## III.   LIBERTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM.

Liberty makes clear in its memorandum that it is simultaneously seeking summary judgment on all of its counterclaims, with the exception of its G.L. c. 93A claim. What it fails to do is to articulate any plausible legal basis for why Liberty would be entitled to summary judgment on its own claims, even if it was entitled to summary judgment on CFN's claims (which it is not).

Liberty's counterclaims against CFN assert that CFN breached its contract and breached the implied covenant of good faith and fair dealing. In support of its request for summary judgment, Liberty merely states that it is entitled to summary judgment if CFN "cannot satisfy

the condition precedent to its right to commissions." Liberty does not even attempt to argue how it is that CFN allegedly breached the contract.

Although CFN's entitlement to commissions is dependent on its continued designation as representative of record, Liberty has not demonstrated how CFN allegedly *breached* its contract if it cannot satisfy this condition precedent. Liberty does not point to any contractual provision which purportedly requires CFN to inform Liberty of the status of its relationships with any groups, nor can it. Liberty offers nothing in the way of legal argument for why it should be entitled to collect damages from CFN in the event that CFN was not the representative of record for any groups set forth in the agreement. The fact that one may elect "restitution" damages for a proven breach of contract does not in any way shed light on what provision Liberty believes CFN "breached" as part of its contract. Liberty is, therefore, not entitled to summary judgment on any of its counterclaims.

## CONCLUSION

For many years, Liberty willingly accepted tens of millions of dollars in premiums each year from CFN's clients knowing full well that CFN's relationships with some of these clients were dormant. Nonetheless, the parties specifically crafted a contractual provision that would grant Liberty the right to terminate CFN and pursue those inactive groups directly while protecting CFN's right to its commissions. To avoid this agreed-upon payment, Liberty manufactured a non-existent contractual "right" that has allowed Liberty to save over $1 million in commissions over the last three years while simultaneously preserving its ability to continue receiving over $100 million in premium. For the reasons set forth above, Liberty breached its contract and the Court should allow CFN's motion, enter summary judgment on Count I of CFN's claims, and deny Liberty's motion on all counts.

CFN AGENCY, INC.
By its attorneys,


*/s/ Joseph P. Calandrelli*
Sean T. Carnathan (BBO# 636889)
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli (BBO# 666128)
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
Tel. (781) 359-9000


## CERTIFICATE OF SERVICE

I, Joseph Calandrelli, hereby certify that on April 2, 2015, I filed the foregoing document with the court's electronic filing system and that counsel for Liberty is registered to receive electronic notice of this filing.


*/s/ Joseph P. Calandrelli*
Joseph Calandrelli


4819-9243-6770, v. 1