UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CFN AGENCY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 12-12091-LTS |
| | ) | |
| LIBERTY MUTUAL INS. CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 112 & 121)

October 23, 2015

SOROKIN, J.

This case arises from a contractual dispute between CFN Agency, Inc. ("CFN") and

Liberty Mutual Insurance Company ("Liberty"). The dispute centers on CFN's entitlement to

commissions from the purchase and renewal of Liberty home and automobile insurance products

by employees of large companies and members of affinity groups which CFN purported to

represent. Pending before the Court are cross motions for summary judgment, which were the

subject of an October 15, 2015 motion hearing. Doc. Nos. 112, 119, 121, 126, 130, 134. The

Court has carefully reviewed the record and the parties' submissions and, for the reasons that

follow, ALLOWS in part Liberty's motion for summary judgment and DENIES in full CFN's

cross motion, as outlined below.

I.    BACKGROUND

    A.    Undisputed Facts

    CFN is in the voluntary benefits business. Doc. No. 127 at ¶ 1. Voluntary benefits are

optional products and services that an employer makes available to an employee, and that the

employee may decide to purchase (or not) for herself.  Id. ¶ 3.  Such benefits often include

discounted homeowners' and automobile insurance, id. ¶ 1, and are distinct from employer-

provided or -subsidized core benefits like health insurance, id. ¶ 3.  CFN negotiates with

insurance carriers and other vendors to obtain discounts on their products and services, then

provides information about those offerings to employees and members of affinity groups through

a customized website called YouDecide.com.  Id. ¶ 4.

Employers and affinity groups typically execute agreements with CFN pursuant to which

they offer some or all of CFN's array of voluntary benefits to their employees or members.  See

id. ¶ 6.  In general, CFN is compensated via commissions paid to it by vendors included on

YouDecide.com when employees or members of CFN's client groups purchase the vendors'

products or services.  See id. ¶ 4.  As relevant here, CFN collects commissions from insurers

when employees or members either purchase or renew insurance policies available through

YouDecide.com, regardless whether the policy was purchased or renewed directly through CFN

or its website.  See id. ¶ 4.

In 1997, CFN established a relationship with Liberty whereby CFN began including on

YouDecide.com discounted homeowners and automobile insurance available through Liberty.

See id. ¶ 17.  The parameters of CFN's relationship with Liberty were defined in an original

1997 contract and amended in a 2002 contract.  Id. ¶¶ 17-19.  At the time of those agreements,

CFN and YouDecide.com were owned by a large insurance company, ACE USA.  Id. ¶ 20.  In

2004, ACE sold both to their present owner, a company called VBenx.  Id.  At that time, Liberty

was the main source of CFN's revenues, providing at least twice as much in commissions as

CFN's next largest revenue source.  Id.  Soon after CFN changed hands, Liberty raised concerns

about the activity levels generated by CFN's clients, many of which CFN's new President and CEO described as "no longer active." <u>Id.</u> at ¶¶ 133-34.

In 2006, CFN and Liberty began negotiating two new contracts relevant here. <u>Id.</u> at 21. The first was an agreement by Liberty to purchase CFN's right to future commissions related to a list of clients which the parties agreed would no longer be considered CFN's clients going forward ("the buy-out agreement"). <u>Id.</u> ¶¶ 139-40; <u>see</u> Doc. No. 123-34. The buy-out agreement also stipulated that CFN would continue to receive limited compensation related to a second list of clients, but agreed to market to such clients only "inactively." Doc. No. 127 at ¶ 141. Days after executing the buy-out agreement, the parties signed an Affinity Marketing Agreement, which replaced the parties' 1997 and 2002 contracts and redefined the relationship between CFN and Liberty as of January 1, 2007 ("the 2007 Agreement"). <u>Id.</u> at ¶¶ 24, 143. The buy-out agreement is referenced in the 2007 Agreement's compensation provisions. <u>See</u> Doc. No. 116-1 at 7 (section 6(c)(iii), regarding limits on CFN's entitlement to renewal commissions).

Several terms of the 2007 Agreement are central to this dispute. In that agreement, CFN's clients – i.e., the employers and affinity groups utilizing CFN's voluntary benefits services – are referred to as "Groups," and the employees or members of Groups are called "Members." <u>Id.</u> at 2. In the section outlining the parties' responsibilities under the agreement, CFN's functions are defined to include "work[ing] closely with the Groups and . . . introduc[ing] the Program to Members by mailing, by coordinating on-site promotional activity with Liberty and by delivering promotional materials which have been expressly approved by Liberty." <u>Id.</u> at 5 (section 5(a)(i)).

Section 6 of the 2007 Agreement defines CFN's entitlement to compensation. <u>Id.</u> at 6-8. It describes Liberty's obligation to pay CFN "New Business Policy Commission" and "Renewal

Commission" for policies sold to or renewed by Members of Groups, and incorporates

commission rates and a Group list set forth in Exhibit A to the agreement.  Id. at 6 (section 6(b)).

Exhibit A is titled "List of Groups" and contains the following preamble:

> To date, ***CFN expressly guarantees that it has been designated as representative
> of record for the Groups listed in this addendum***. . . . This list of Groups will be
> expanded from time to time by mutual agreement of the parties.

Id. at 14 (emphasis added).  Section 6 further provides:

> (d) CFN's entitlement to any compensation hereunder will be conditioned upon:
> *       *       *
>       (iii) with respect to a specific Group:
>             A.  CFN's continued designation as a representative of record for
>                 Group; and
>             B.  duration of Liberty's participation in YouDecide.com with
>                 respect to a specific Group.

Id. at 7-8.

Liberty retained the right to remove Groups from the scope of the 2007 Agreement, but

could avoid payment of renewal commissions to CFN only if the removal was "for one of the

reasons outlined in section 12c of this Agreement."  Id. at 7 (section 6(b)).  Those reasons

include "termination of CFN's designation by Group to represent Group hereunder" and

"dissolution of Group."  Id. at 10 (section 12(c)(iv) and (v)).  In order to remove a Group for any

other reason, Liberty was required either to "continue [paying] Renewal Policy Commission for

policies originally sold within that Group for a period of ten (10) years after the removal of such

Group or as long as a policy continues to renew with Liberty, whichever period is shorter," or to

"pay CFN a single lump sum representing 3.5X the terminated Group's current annualized

Renewal Policy Commission."  Id. at 7 (section 6(b)).

Between 2007 and 2011, the 2007 Agreement was amended a number of times, primarily

to add or remove Groups or to change the commission percentages contained in Exhibit A.  Doc.

Nos. 116-17, 116-18, 123-37, 123-38, 123-39, 123-40, 123-41.  At least three of those

amendments repeated CFN's original "guarantee" that it "ha[d] been designated as representative of record for the Groups" included on the list.  See, e.g., Doc. No. 116-17 at 3; 123-38 at 8; 123-41 at 3.  In some of these instances, Groups were removed with CFN's consent because another broker had replaced CFN as the Group's representative, or because the entity had gone out of business.  See Doc. No. 127 at ¶¶ 34-35, 37.

At the heart of this dispute is a distinction between two broad categories of CFN's clients.  The first includes Groups which CFN considers "legacy," "dormant," or "version 1" clients, which CFN's current owners inherited when they acquired the business in 2004, and each of which have (or had) access to an older version of CFN's services.  See id. ¶¶ 40-41.  The second, smaller category is Groups which CFN considers "active" or "version 2" clients, with whom CFN's current owners have developed relationships, and which utilize a newer and more powerful version of CFN's services.  See id. ¶¶ 38-39; Doc. No. 116-14 at 5.  Liberty concedes CFN is entitled to commissions related to Groups falling in the latter category; this litigation arose when it ceased making payments to CFN related to Groups falling in the former category.  Doc. No. 127 at ¶¶ 39, 93-95.

Citing concerns regarding the lack of activity it saw flowing from the Groups included in the 2007 Agreement, Liberty wrote to CFN on October 20, 2011 to demand written proof, with respect to all but sixteen of the Groups, that CFN then held "representative of record designation and that Liberty Mutual is a carrier that [was then] offered for that [G]roup" through CFN's service.  Doc. No. 116-21.  Liberty's letter stated that it would cease making compensation payments related to any Group for which CFN failed to provide such proof within sixty days of the letter.  Id.  CFN did not provide the information requested in the letter; thereafter, Liberty stopped commission payments for the Groups at issue.  Doc. No. 127 at ¶ 95; see id. ¶ 174

(stating payments ceased on January 29, 2012); Doc. No. 116-44 at 4-5 (showing CFN provided

a contract and website screenshot for a single Group, months after payments had ceased, and

requested reinstatement of all payments based on its assurance that it possessed such

documentation for every other Group at issue, a proposal which Liberty rejected).

Liberty reinstated payments, including payments of commissions retroactive to the date

they had stopped, for specific Groups after receiving information confirming CFN's status as

their representative.  See Doc. No. 116-44 at 4 (noting Liberty had independently received

validation from one Group at issue); Doc. No. 116-45 (reflecting CFN's discovery in this action

included validation of its status for twelve other Groups).  For the majority of Groups, though,

Liberty stopped using codes that permitted it to track new business attributable to CFN as of May

29, 2012, when CFN still had not proven to Liberty's satisfaction that it retained its

representative of record designation for such Groups.  Doc. No. 127 at ¶ 176.

One other issue is relevant to this litigation.  Sometime before the 2007 Agreement,

Liberty provided CFN with access to a "real-time quoting system," through which Members

could electronically complete applications and, within minutes, receive electronic quotes for

Liberty's insurance products.  Id. ¶ 101.  By mid-2008, Liberty had discontinued use of that

system, which it viewed as obsolete, intending to replace it with more streamlined technology.

Id. ¶¶ 102-03.  Liberty provided CFN with a telephone-based "work around" system to replace

the quoting technology while the new system was completed.  Id. ¶ 103.  Throughout the

development process, Liberty communicated with CFN and stated its intention to reinstate

CFN's "real-time quoting" capabilities once the new system was operational.  Id. ¶ 105.

Ultimately, however, Liberty decided not to invest in the technology necessary to implement its

new system for CFN, citing the parties' ongoing contract dispute and the uncertain future of their relationship. Id. ¶¶ 106-09.

      B.      <u>Procedural Posture</u>

      CFN sued Liberty in November 2012, alleging Liberty breached the 2007 Agreement (both its explicit terms and its implied covenant of good faith and fair dealing), was unjustly enriched, violated Chapter 93A of the Massachusetts General Laws, and tortiously interfered with CFN's relationships with prospective clients.  Doc. Nos. 1, 36.  Liberty counterclaimed, seeking declaratory relief and alleging CFN breached both the explicit and implicit terms of the 2007 Agreement and violated Chapter 93A.  Doc. Nos. 11, 37.  CFN seeks unpaid commissions and other damages; Liberty seeks return of commissions it previously paid.  Payments related to eighty-five Groups are at issue.  The parties have resolved their claims as to a small number of Groups, but dozens of Groups remain in dispute.  <u>See</u> Doc. No. 119 at 2 n.1 (noting Liberty agreed to pay commissions for twelve Groups where CFN's relationship was established through discovery, and one additional group where such proof appeared imminent); Doc. No. 121 at 18 (referencing generally, but not identifying, eight Groups which CFN "acknowledges were terminated and is therefore not seeking commissions").[1]

      The parties have filed cross motions for partial summary judgment.  Doc. Nos. 112, 121. Liberty seeks summary judgment on all claims and counterclaims, except for its own 93A counterclaim.  Doc. No. 119 at 14.  It asserts that CFN was not the representative of record for the disputed Groups, either because the record contains no contract demonstrating such a relationship, because any such relationship was terminated or had expired, or because the record

---

[1]  The eight Groups referenced by CFN are presumably those which Liberty identifies in its brief as Groups that remain in dispute due to Liberty seeking return commissions.  <u>See</u> Doc. No. 119 at 1 n.1.

contains no evidence showing the Group itself acknowledged or was aware of the relationship during the relevant time period.  <u>See generally</u> Doc. No. 119.  Liberty also argues that CFN had no right – contractual or otherwise – to "real-time quoting" technology.  <u>Id.</u>  CFN opposes Liberty's motion and moves for summary judgment on its own breach of contract claim, arguing Liberty had no right to demand proof of CFN's representative status or to cease payments absent evidence that a particular Group had explicitly fired CFN or replaced it with another broker.  <u>See generally</u> Doc. No. 121.  The motions are fully briefed, and the Court heard oral argument on October 15, 2015.

II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>accord</u> <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir. 1995).  The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation."  <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir. 2009) (internal quotation marks omitted).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50.

"Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  Nat'l Amusements, Inc., 43 F.3d at 735 (internal citation omitted).

III.   DISCUSSION

   A.   Liberty's Motion: Breach of Contract

Liberty seeks summary judgment on its breach of contract counterclaims and CFN's parallel claims.  It argues CFN breached the 1997 Agreement by collecting commissions to which it was not entitled under the unambiguous terms of the contract.  The record before the Court supports Liberty's motion with respect to certain Groups, but does not warrant wholesale entry of summary judgment as to all Groups currently in dispute.

As relevant here, the plain terms of the contract create two conditions precedent to payment of commissions to CFN for business flowing from any Group.[2]  First, CFN must retain a "continued designation as a representative of record" for the Group.  Doc. No. 116-1 at 7-8 (section 6(d)(iii)(A)).  Second, Liberty must be included as a vendor available through the Group's YouDecide.com website.  Id. (section 6(d)(iii)(B)).  As discussed in this section, the undisputed facts justify entry of judgment in Liberty's favor on both parties' breach of contract

---

[2]  The contract also conditions payment on other factors not relevant to this dispute, such as CFN's maintenance of proper licenses.  See Doc. No. 116-1 at 7.

claims as to thirty-two Groups based on CFN's failure to satisfy one of these two conditions precedent.

              1.    *Representative of Record Designation*

The record contains no evidence from which a reasonable jury could find CFN enjoyed a "continued designation as a representative of record" as to twenty-seven Groups.[3]  The fate of both parties' breach of contract claims as to these Groups turns on the meaning of the term "representative of record," as used in the 2007 Agreement, and the circumstances under which a broker like CFN can lose its designation as such.

Based on the record submitted by the parties, the Court has little trouble concluding that the term "representative of record" is not ambiguous, and that in the context of the 2007 Agreement it is synonymous with the term "broker of record."  This is so whether the contract is considered alone, as described by individuals involved in negotiating its terms, or in light of the parties' behavior when operating pursuant to the contract.  First, the 2007 Agreement contains both terms and uses them interchangeably.  See Doc. No. 16-1 at 2, 7, 8, 14 (using "representative of record"); id. at 6 (using "broker of record"); see also Doc. No. 123-34 at 2 (referencing CFN's "broker of record date" for various groups in the related buy-out agreement between the parties).[4]  Second, the representatives who signed the 2007 Agreement on behalf of

---

[3]  These twenty-seven Groups are: Acuity, Advanced Technology Materials, Inc., Catholic Health East, Compass Group Ltd., Cox Communications Inc., DaimlerChrysler, DuPont, Ericsson, Family Christian Stores, Farmland, the FBI, Federal Civilian Employees, First Group America, H.J. Heinz Co., Methodist Hospital, New York Presbyterian Hospital, Palm Harbor Homes, PNC Insurance, Progressive Corporation, Sony Music, Southwest Airlines Company, Teleflex, Tenet Healthcare Corporation, Tribune Company, U.S. Office Products, VAEA, and Weight Watchers.

[4]  The buy-out agreement "re-set the ***broker of record*** date" for a number of Groups, Doc. No. 123-34 at 2 (emphasis added), and the 2007 Agreement specifically referenced and incorporated the buy-out agreement in its compensation provisions related to business sold to Groups "for which CFN's ***representative of record*** designation has been re-dated" pursuant to the buy-out

the parties viewed the terms as interchangeable.  See Doc. No. 116-9 at 4 (Christopher Capone,

who signed on behalf of Liberty, testified he was unaware of a "dramatic[] differen[ce]" in

definition); Doc. No. 116-11 at 5, 11 (Salvatore Percia, who signed on behalf of CFN,

understood generally that CFN's entitlement to renewal commissions was contingent on its status

as "broker of record," and agreed the terms are "synonymous"); Doc. No. 123-11 at 12 (Capone

used the terms interchangeably in his deposition answers about the relevant clause).[5]

And finally, the parties conducted themselves – and corresponded with one another

during the relevant time period – in such a way that reflects a mutual understanding that the two

terms shared a meaning.  See, e.g., Doc. No. 116-13 at 4 (Kyle Fabrizio of CFN viewed relevant

question for purposes of CFN's relationship with Liberty as whether CFN had and maintained its

"broker of record designation" with clients); Doc. No. 116-14 at 5 (Ronald Fulginiti of CFN

agreed that a loss of "broker of record . . . would stop commissions" from Liberty); Doc. No.

116-19 at 3 (email from Eli Silberzweig of Liberty to three CFN representatives regarding an

amendment to the 2007 Agreement which eliminated certain Groups because "contract cites

comp[ensation] contingent on [broker of record]").  Under these circumstances, the undisputed

---

agreement, Doc. No. 116-1 at 7 (emphasis added).  Thus, in two related agreements executed by
the parties within days of one another, the two terms were used interchangeably in the exact
same context.
[5]  Other representatives of both companies testified that they, too, understood the two terms to
mean the same thing.  See, e.g., Doc. No. 116-12 at 4 (Mark Parabicoli of Liberty); Doc. No.
116-15 at 4-5 (Brent Finnegan of CFN); Doc. No. 123-2 at 11 (Eli Silberzweig of Liberty).  In
fact, there is no evidence before the Court reflecting that any individual representing either party
believed the term "representative of record" meant anything other than "broker of record."  The
most CFN has offered are deposition excerpts showing certain of its own employees – who were
not involved in negotiating the relevant contract – were unfamiliar with the term or could not
define it.  See, e.g., Doc. No. 123-10 at 4 (Ronald Fulginiti); Doc. No. 123-12 at 5 (Kenneth
Phillips); Doc. No. 123-14 at 3 (John Mark Young); see also Doc. No. 123-31 at 5 (reflecting
CFN's expert's opinion that "[t]he term 'representative of record' is not a term that has a
generally recognized meaning within the insurance industry").  Such evidence is insufficient to
raise a genuine dispute here as to the meaning of the term in the context of this case.

facts can only support a conclusion that the terms "representative of record" and "broker of record" share a meaning in the context of the 2007 Agreement.  Thus, CFN's entitlement to compensation under that agreement turns on its "continued" status as "broker of record" for any given Group.[6]  See Doc. No. 116-1 at 8.

The next question, then, involves what it means for CFN's "representative of record designation" to "continue[]," i.e., under what circumstances the designation is gained and lost.  As an initial matter, the parties agree (and the record confirms) that the designation arises by agreement between the broker and the client, and that the designation usually is reflected in a contract or letter signed by the client.[7]  See Doc. No. 127 at ¶ 120.  Furthermore, there is no real dispute here that the designation typically is lost in one of two ways:  either the existing broker is replaced when the client elects to grant the designation to a new broker, or the existing broker is otherwise fired or terminated by the client.  See id. ¶ 121; Doc. No. 123-2 at 17.

The parties' views diverge with respect to what constitutes a firing or termination – in other words, what conduct by a client is sufficient to legally strip a broker of its previously granted representative of record designation.  CFN urges that nothing short of a formal, written declaration of termination is required.  See Doc. No. 123-6 (deposition testimony by CFN's corporate representative that an "affirmative termination letter" is required); Doc. No. 123-31 at

---

[6]  In light of this conclusion, for the remainder of this opinion, the Court will use the terms interchangeably.

[7]  CFN has not produced contracts showing its designation by a number of Groups at issue, but it does not claim to have received such designation by verbal agreement.  Rather, it suggests there were written contracts or letters for each Group at one time (often dating back a decade or more), but that some contracts were lost when the business changed hands in 2004.  See, e.g., Doc. No. 115-1 at 6 (stating CFN's belief that contracts from accounts which predated the current owners' acquisition of the business "w[ere] lost in the asset transfer").  As such, the Court notes, but need not discuss at length, the possibility that the designation could be conferred via an oral agreement.

5 (opinion by CFN's expert that "standard [industry] practice" requires "express[] resci[ssion]");

Doc. No. 127 at ¶¶ 122-23.  Liberty, on the other hand, relies on general agency principles and

suggests that a whole range of actions by a client – including "inactivity" – might be sufficient to

demonstrate an intent to revoke a broker's authority to act on a client's behalf.  See Doc. No. 119

at 14-18; Doc. No. 127 at ¶¶ 122-23.

        The Court agrees with Liberty and finds that traditional agency principles are relevant to

a determination of whether particular Groups' actions operated to terminate CFN's designation

as representative of record here.  Although the relationships at issue operate in the specific arena

where voluntary benefits and the insurance industry intersect, CFN has cited no legal authority

suggesting that anything about this particular milieu removes it from the reach of general agency

law.[8]  The relationships at the heart of this case involve CFN's clients agreeing to permit CFN to

act on their behalf in soliciting information from third parties (i.e., vendors providing insurance

products and other voluntary benefits), subject to the clients' control, and CFN's consent to so

act.  See, e.g., Doc. No. 115-4 (contract establishing relationship between CFN and Compass

Group, one of its clients).  Such a relationship satisfies the very definition of agency, regardless

whether CFN and its clients used the term "agency" to describe their association – and regardless

whether CFN and Liberty described CFN's status with respect to its clients in terms of "agency."

See Restatement (Third) of Agency §§ 1.01, 1.02.

_____

[8]  In fact, CFN cited no legal authority of any sort, besides a handful of decisions stating well-established rules of contract interpretation, in support of any of its arguments in its opening brief, see generally Doc. No. 121, and no law at all in its reply brief, see generally Doc. No. 130.  Nor did CFN offer legal authority for its positions during oral argument, where counsel for CFN summarily contended that agency law should not apply because CFN did not truly represent the Groups, but rather merely set up portals through which Members could access voluntary benefit services – a view which is belied by the language of the 2007 Agreement itself.  See, e.g., Doc. No. 116-1 at 5, 10 (noting CFN's duty to "work closely with *the Groups*" and referencing termination of CFN's authority "to represent *Group*") (emphasis added).

Having determined that traditional agency principles apply, the only remaining question is whether those principles mandate a finding at this stage of the proceedings that CFN at some point lost its "continued designation as a representative of record" for the disputed Groups. Although Liberty suggests the answer to this question is "yes" as to every disputed Group, the record as it currently stands does not permit such a broad conclusion.

Pursuant to the law of agency, CFN's designation as a representative of record for a given Group – i.e., its authority to act as a broker on behalf of that group – could terminate by virtue of an explicit agreement between CFN and the Group, or "upon the occurrence of circumstances on the basis of which [CFN] should reasonably conclude that the [Group] no longer would assent to [CFN's] taking action on the [Group's] behalf." Restatement (Third) of Agency § 3.09; see also Gagnon v. Coombs, 654 N.E.2d 54, 59-60 (Mass. App. Ct. 1995) (applying "objective principles" from Restatement (Second) of Agency, including that an agent may do only what he reasonably infers he is authorized to do in light of the facts the agent knows at any given time, irrespective of the scope of authority originally granted by agreement of the parties). As CFN notes, this "is inherently a factual matter," Doc. No. 121 at 19, and one which the summary judgment record does not allow the Court to decide with respect to many Groups at this juncture. See discussion § III(A)(3), infra. The undisputed facts, however, do permit resolution now as to three categories of Groups.

First, the record contains unrebutted evidence that the contracts in which eight Groups designated CFN as their representative of record expired either before or during the time period relevant to this action. See Doc. No. 115-6 at 3 (contract with DuPont expired in 2002 unless DuPont elected, with advance written notice, to extend it); Doc. No. 115-8 at 2 (letter of agreement with organization representing the FBI, Federal Civilian Employees, and VAEA

expired in 2002); Doc. No. 115-9 at 2 (contract with Methodist Hospital expired in 2008 unless

renewed via "a mutually executed amendment"); Doc. No. 115-12 at 2-3 (letter of understanding

with PNC Insurance expired in 1999); Doc. No. 115-13 at 3, 5 (letter of agreement with Sony

Music expired in 2001 unless renewed "upon written agreement of the parties"); Doc. No. 115-

15 at 2 (contract with Teleflex expired in 2006 unless renewed "upon agreement [of the]

parties").[9]  CFN failed to address the expired contracts in its briefing.  Moreover, the record

contains no evidence demonstrating the contracts were renewed or extended in accordance with

their terms, or that these Groups designated CFN as their representative in any other manner.[10]

As such, there is no genuine dispute that CFN's status as representative of these eight Groups

expired, eliminating CFN's entitlement to commissions.

Second, the record contains unrebutted evidence that twelve Groups affirmatively

terminated their relationships with CFN, and that CFN itself viewed such relationships as

terminated.  See Doc. No. 115-2 at 15, 19 (CFN's interrogatory responses admitting Compass

Group, Cox Communications, and First Group America terminated their contracts with CFN in

---

[9]  Besides the expired contracts, there is additional evidence in the record showing CFN was
aware that its relationships with DuPont and Methodist Hospital had terminated.  See Doc. No.
115-3 at 3, 6 (client list attached to internal CFN email in 2008 describing DuPont as a
"terminated client[]"); Doc. No. 115-10 at 2-3 (email to CFN representatives from Liberty
representative stating "another broker has [broker of record]" for Methodist Hospital).
[10]  There is evidence in the record reflecting CFN's belief that it retained its designation as a
representative of record for any Group for which it continued to maintain a YouDecide.com
website and/or for which Liberty continued to pay it commissions.  See Doc. No. 116-2 at 9
(testimony by corporate representative that Liberty's payments were proof of CFN's
designation); Doc. No. 123-6 at 5-6 (testimony by corporate representative that designation
continued as to DuPont because "the website is still up," despite finite term in original contract
and absence of written extension).  This belief – which the Court accepts for present purposes,
despite its apparent unreasonableness – cannot override the language of the relevant contracts,
where such language plainly limited the term of the agreement absent explicit or written
renewals, nor is it enough to overcome unambiguous evidence of termination or a total lack of
evidence of any agreement or communication with certain Groups.

2011);[11] Doc. No. 115-3 at 3, 6-7 (client list attached to internal CFN email in 2008 describing

Catholic Health East, H.J. Heinz, Palm Harbor Homes, Progressive, and Tenet as "terminated

clients" and removing them from a mass emailing regarding Liberty products); Doc. No. 115-5 at

2 (letter from Cox Communications to CFN terminating relationship as of March 2011); Doc.

No. 115-7 at 2 (internal CFN emails reflecting termination of relationship with Ericsson in

March 2009); Doc. No. 115-11 at 2 (letter from New York Presbyterian Hospital to CFN

terminating relationship in July 2012 "[t]o the extent that [it] has not been terminated

previously");[12] Doc. No. 115-14 at 2 (email from Southwest representative to CFN terminating

relationship as of May 2011);[13] Doc. No. 115-20 at 2 (internal CFN email in 2008 stating H.J.

Heinz "is terminated and requested such in writing"); Doc. No. 115-24 at 4-5 (emails from

DaimlerChrysler representative to CFN representative in 2007 stating her company's

"arrangement with CFN terminated several years ago," explaining that "some years ago" she told

"CFN account representatives" that the company wished "to discontinue the relationship," and

further instructing CFN to cease using "direct references to our company, our employees and our

company logo"); Doc. No. 116-42 at 2 (email from J.H. Heinz representative to CFN in 2007

---

[11] It bears noting that in this early version of its interrogatory responses, CFN also characterized
its relationship with H.J. Heinz as having been terminated.  See Doc. No. 115-2 at 20, 36.

[12] If Liberty wishes to pursue a claim that CFN's relationship with New York Presbyterian
Hospital (or any other Group who sent a specific, dated termination letter) terminated before this
letter, it may do so as this case moves forward.  However, the record before the Court is
insufficient to permit such a finding at this time.

[13] CFN's corporate designee testified that "when the smoke cleared," after Southwest's email
terminating the relationship, and after a related cease-and-desist letter from Southwest's counsel,
Southwest rescinded its termination and the relationship continued.  Doc. No. 123-8 at 13; but
see Doc. No. 128-2 at 16 (same designee further stating that after the termination email, he had
conversations with someone at Southwest who "didn't object to [CFN] continuing to host the site
and have it up and available," but that no one from CFN had communicated with anyone from
Southwest since that time).  This vague and self-serving testimony about an oral rescission of a
written termination of a written contract, absent supporting documentation, is insufficient to raise
a genuine issue of material fact as to the status of CFN's relationship with Southwest.

saying the company "will no longer be continuing to offer" YouDecide.com).  Again, CFN's

briefing does not address this evidence or these Groups specifically, nor does the record contain

anything explaining or contradicting the termination evidence offered by Liberty as to these

Groups.  Thus, there is no genuine dispute that CFN's status as representative of these twelve

Groups was terminated, eliminating CFN's entitlement to commissions.

Third, as to seven other Groups, the record contains no evidence establishing the

existence of any relationship at all with CFN, let alone the scope, duration, or continuing nature

of such a relationship.  CFN has not produced – either to Liberty in response to its discovery

requests seeking such information, or to the Court to counter Liberty's summary judgment

motion – any contract, letter of agreement, or other document reflecting the establishment of a

relationship between itself and the following seven Groups: Acuity Brands, Advanced

Technology Materials, Inc., Family Christian Stores, Farmland, Tribune Co., U.S. Office

Products, and Weight Watchers.  See Doc. No. 115 at ¶ 6.  Furthermore, it has identified no

documents or other evidence reflecting any communications at all between itself and any of these

Groups.  See Doc. No. 115-1 at 5, 15, 33-34 (identifying no specific communications or

documents related to five of the seven Groups, and providing no information at all regarding the

remaining two); cf. Doc. No. 127 at ¶ 42 (disputing Liberty's list of Groups without any

identified communications only by noting that for some groups – not including the seven listed

here – CFN did produce information about website modifications it performed for individual

YouDecide.com sites).  Once more, CFN's failure to address these Groups specifically or

identify a single shred of evidence from which a factfinder could reasonably infer CFN ever had,

let alone continued to maintain, a relationship of any sort with them means that CFN cannot

establish it was entitled to commissions for these Groups.[14]

Accordingly, as to the twenty-seven Groups identified in this section, the undisputed facts

support a finding that CFN failed to satisfy a condition precedent to compensation under the

unambiguous terms of the 2007 Agreement – specifically, it did not maintain a "continued

designation as a representative of record."[15]  As such, it was not entitled to the commissions it

accepted from Liberty, a fact which the record demonstrates it knew or should have known as a

matter of law.  The Court has no trouble concluding that acceptance of such commissions under

the circumstances amounted to a breach of the 2007 Agreement in at least one of two ways:

first, it breached the plain terms of the compensation provision of the agreement, which

conditioned payment on certain circumstances (and, as a logical extension, plainly meant that no

payment was to be accepted if CFN was aware those conditions were not met); and second,

CFN's knowing and repeated acceptance of payments to which it was not entitled under the plain

terms of the 2007 Agreement certainly breached the covenant of good faith and fair dealing

implicit in that agreement.  Thus, Liberty's motion for summary judgment as to its breach of

contract counterclaims is ALLOWED insofar as these twenty-seven groups are concerned.

---

[14]  When asked by Liberty to identify "all evidence which you contend demonstrates 'CFN's continued designation as a representative of record for [each] Group'" at issue, CFN's response with respect to each of these seven Groups was nearly identical, stating: the account predated the 2004 sale of CFN to its current owners; any contract may have been "lost in the asset transfer"; no one ever told CFN it had been replaced by another broker; and Liberty paid commissions to CFN for the Group during the relevant time period.  See Doc. No. 115-1 at 15, 33-34; Doc. No. 115-2 at 5-6.  These assertions alone cannot create a genuine dispute as to CFN's status and avoid summary judgment.

[15]  Notably, CFN has not suggested that it was awarded the necessary designation by any Group in any form besides through a written contract or letter of agreement, or in any general "broker of record letters" that might not be subject to the time limitations contained in some of the contracts it has provided to Liberty in discovery.

2.      *Inclusion of Liberty on YouDecide.com*

For five other Groups, the record contains no evidence from which a reasonable jury could find that "Liberty's participation in YouDecide.com with respect to [those] specific Group[s]" continued during the relevant time period.[16]  See Doc. No. 116-1 at 8.  In other words, the record does not support a finding that CFN maintained a website at all for these Groups, or that the relevant website included Liberty products.[17]

Under the unambiguous terms of the 1997 Agreement, CFN's entitlement to commissions related to any Group depends on its maintenance of a customized YouDecide.com website for that Group which includes Liberty's products as an available offering.  See Doc. No. 116-1 at 8.  Thus, if CFN ceased to operate a YouDecide.com website for any particular Group, or if a Group's YouDecide.com website did not include information about Liberty's home and/or auto insurance products, CFN would not be entitled to "any compensation" from Liberty under the 1997 Agreement.  Id.

Liberty has submitted internal emails produced by CFN in discovery which show that, as of April 2009, the YouDecide.com sites for two Groups (Harnischfeger and Montgomery Ward & Co.) "no longer exist[ed]."  Doc. No. 115-10 at 2.[18]  It also has submitted documents showing

---

[16]  These five Groups are: Advantica, Bankers Cooperative Group, Federal Express, Harnischfeger, and Montgomery Ward & Co., Inc.

[17]  Although this issue was not explicitly developed in the parties' opening briefs, it was noted by the Court after review of the summary judgment record and discussed during oral argument on the pending motions.  See Fed. R. Civ. P. 56(f).  When asked about it by the Court, CFN's counsel was not willing to acknowledge this second condition precedent, despite the clear terms of the contract, but CFN has not requested time or leave to address the issue further.  CFN's summary suggestion that a generic YouDecide.com website, accessible to anyone, is sufficient to satisfy the condition as to every Group disregards the contract language.

[18]  The emails make the same claim as to a third disputed Group, Modis.  Doc. No. 115-10 at 2.  CFN's interrogatory responses, however, state that the website for Modis "remains active and in use today."  Doc. No. 115-1 at 22.  This discrepancy is appropriately explored at trial in light of that under-oath statement.

CFN's relationships with three other Groups were limited in scope and did not include authorization to offer Liberty's products.  See Doc. No. 115-16 (establishing a relationship between CFN and Advantica only for purposes of offering a First USA Visa Card); Doc. No. 115-18 (establishing a relationship between CFN and Bankers Cooperative Group to offer only those services specified in an attached Schedule A, but failing to include any such schedule referencing Liberty or its categories of products); Doc. No. 115-20 at 2 (reflecting Federal Express did not offer insurance products through YouDecide.com as of May 2008); see also Doc. No. 115-3 at 6 (same).  CFN has not directly responded to this deficiency, let alone offered evidence suggesting such websites did exist and/or included Liberty products, and the Court has detected no such evidence in its review of the record.

Under these circumstances, Liberty has satisfied its summary judgment burden and demonstrated that CFN was not entitled to commissions for these groups.[19]  CFN's acceptance of such commissions breached either the express terms of the 2007 Agreement or its implicit duty of good faith and fair dealing.  As such, Liberty's motion for summary judgment as to its breach of contract counterclaims is ALLOWED insofar as these five groups are concerned.

3.    *Groups Remaining for Trial*

The rulings discussed in the previous two subsections resolve the parties' breach of contract claims with respect to thirty-two Groups,[20] but the parties' dueling breach of contract

---

[19]  As to the former two groups, where internal email correspondence reflects that websites no longer existed in April 2009, CFN's entitlement to commissions ceased as of the date on which such websites were eliminated, assuming that date is ascertainable by the parties.  As to the latter three groups, CFN never was entitled to commissions from Liberty.

[20]  To the extent CFN's breach of contract claims rest on allegations that Liberty owed it commissions for any of these thirty-three Groups for the time period after Liberty stopped making such payments, Liberty's motion also is ALLOWED.  Liberty is entitled to entry of judgment in its favor on such claims, which are the converse of Liberty's counterclaims regarding commission payments, for the same reasons discussed above.

claims will proceed to trial insofar as commissions related to the fifty-three remaining groups are

concerned.[21]  In the Court's view, those Groups may be amenable to division into the following

three categories as the parties seek to organize and streamline the evidence for trial.[22]

*First*, as to a number of Groups, CFN has produced affirmative communications from the

Group which stop short of saying "[Group] hereby ends its contractual relationship with CFN

and rescinds its representative of record designation," but which Liberty will argue support an

inference of termination under traditional agency principles.  These Groups appear to present the

strongest case for Liberty at trial.

One example of such a Group is The Home Depot.  In March of 2000, CFN and The

Home Depot signed a letter of agreement pursuant to which The Home Depot began

participating in YouDecide.com, and CFN became the designated representative.  Doc. No. 116-

7.  The agreement had an automatic renewal provision and required written notice if a party

wished to terminate the relationship.  Id. at 2. The record demonstrates that in 2001, The Home

Depot notified CFN that it intended to terminate their relationship, but did not memorialize that

---

Minor disputes as to timing may remain as to some of these Groups.  For example, the
Court cannot ascertain based on the record before it precisely when CFN first internally viewed
certain groups as "terminated," or when CFN disabled certain Groups' YouDecide.com websites.
Such questions appear to be reasonably amenable to resolution by the parties in light of the
guidance set forth herein, without further intervention by the Court.

[21] If the parties determine that any of the remaining Groups should have been included in a
category of Groups discussed above (e.g., if documents not reproduced for the Court establish
that CFN ceased to maintain a website for any additional Group as of a certain date), the Court
expects that the parties will resolve their related breach of contract claims as to those Groups in
accordance with this decision, without the need for further litigation.

[22] The Court previously encouraged the parties to divide the Groups into meaningful categories
– an invitation which Liberty accepted and CFN ignored in the summary judgment submissions.
In a case of this nature, where all involved would benefit from avoiding transforming one case
into a complicated series of dozens of mini-trials, such efforts to maintain perspective and
organization are critical.  Both parties should endeavor to utilize summary charts and lists as
appropriate in future filings.

intent in writing.  Doc. No. 115-20 at 2.  Thereafter, it signed a contract with Metropolitan

requiring it to exclusively offer that company's home and auto insurance (a fact of which neither

CFN nor Liberty was aware),[23] Doc. No. 116-34, and significant turnover in The Home Depot's

human resources department eliminated everyone with any relationship to, or knowledge of,

YouDecide.com or CFN, Doc. No. 116-33 at 7.  Internally, CFN representatives referred to The

Home Depot as a "non-client," Doc. No. 116-29 at 4, but elected to "just leave this case alone"

due to "the significant current Liberty revenue," Doc. No. 115-20 at 2.[24]  See also Doc. No. 116-

29 at 4-5; Doc. No. 116-32 at 2.  Although these facts strongly support Liberty's view that CFN

knew, or should have known, that by 2007 it no longer was authorized to represent The Home

Depot, summary judgment is not appropriate in light of testimony by The Home Depot's

corporate designee that no written termination of the original agreement had been sent (as

required by the terms of that agreement), Doc. No. 116-33 at 7, and evidence that the

YouDecide.com website for The Home Depot continued to draw traffic (albeit decreasing and

meager traffic) through the relevant time period, Doc. No. 128-3 at 26-29.  Weighing these

modest facts against the formidable evidence presented by Liberty is appropriately left to the

factfinder at trial.  See Call v. Fresenius Med. Care Holdings, Inc., 534 F. Supp. 2d 184, 192 (D.

---

[23]  CFN was aware, at least as of 2010, that The Home Depot had "a very strong and large
MetLife program," Doc. No. 116-29 at 4, but there is no evidence it knew of a supplanting
relationship with another broker or of the exclusive nature of the contract between The Home
Depot and Metropolitan.
[24]  Somewhat tellingly, CFN characterized its relationship with The Home Depot as having been
terminated in an early version of its interrogatory responses, Doc. No. 115-2 at 36, but retracted
this assertion in its supplemental responses, Doc. No. 115-1 at 32.  Additionally, CFN's
corporate designee testified that CFN had not communicated directly to employees of The Home
Depot since 2008.  Doc. No. 128-2 at 24.  But at least one CFN employee testified that "non-
client" meant a legacy client without an active relationship at the time.  Doc. No. 123-18 at 9.

Mass. 2008) ("The evidence provided by [the plaintiff] regarding [an element of her claim] is meager, but it just barely allows her to survive summary judgment on this issue.").

Another Group in this category is J.P. Morgan Chase. CFN apparently produced a contract establishing a relationship between itself and J.P. Morgan Chase, and that contract contained no time limitation. See Doc. No. 115 at ¶ 9. But in 2007, a representative of J.P. Morgan Chase notified CFN that it no longer offered YouDecide.com to employees, and that it had formed a relationship with a different broker for voluntary benefits. Doc. No. 116-29 at 2. In response, CFN planned to "do nothing in hopes to not disrupt the Liberty revenue." Id. The following year, J.P. Morgan Chase asked CFN to remove the company's logo from the YouDecide.com site, and requested that CFN stop sending mass communications to its employees. Id. Internally, CFN noted that, "at the end of the day," J.P. Morgan Chase "[was]n't a client." Id. Once again, despite this persuasive showing by Liberty, summary judgment is not appropriate in light of deposition testimony by the Group's former director of benefits[25] that information about YouDecide.com still appeared in materials J.P. Morgan Chase gave to its retiring employees in 2012, and that she knew of the CFN contract and viewed it as "still in force" during the relevant time period. Doc. No. 123-23 at 5-6; Doc. No. 128-4 at 4, 6.[26]

_____

[25] The record reflects that this witness retired from her position at J.P. Morgan Chase in 2013. Doc. No. 128-4 at 4. Liberty states in the margin of its reply brief that CFN subsequently hired her, and implies that her deposition testimony was an attempt "to spin things as positively as possible for CFN." Doc. No. 126 at 5 n.6. However, Liberty's assertion is not evidence, and nothing in the record shows whether, in what capacity, or for how long the witness has been employed by CFN. Proof regarding those questions, and questions of how such information impacts the credibility of this witness's testimony, are issues for trial.

[26] Two other Groups that appear to fall in this category are worth noting. No contract exists as to ACE USA, Inc., the previous owner of CFN, and the record reflects that ACE informed CFN soon after the present owners acquired it in 2004 that the website associated with its company should be disabled. Doc. No. 115-1 at 5; Doc. No. 116-11 at 6; Doc. No. 123-4 at 10. It appears as though CFN has provided Liberty with a spreadsheet reflecting ongoing website activity for ACE, though, and ACE's counsel only recently sent a cease-and-desist letter to CFN regarding

*Second*, as to certain other Groups, CFN has produced documents reflecting a pattern of unresponsiveness to CFN's efforts to solicit or engage them over an extended period of time. For these Groups, Liberty will argue that the lack of receptiveness – or, in some instances, total silence in response – to CFN's proposals should likewise cause a jury to infer termination.  CFN has produced contracts with these Groups which automatically renewed, and the record does not contain evidence of explicit discussions of termination.  E.g., Doc. No. 115-1 at 13, 16, 18, 23. However, when representatives of these Groups did respond to CFN's apparent solicitations, sometimes many years after the execution of the relevant contracts, their responses often either implied or stated directly that they no longer were using YouDecide.com.  Examples of such Groups include: Coca-Cola, Doc. No. 115-23; General Electric, Doc. No. 115-26; Ingersoll Rand, Doc. No. 115-28; and Nestle, Doc. No. 115-30.

*Third*, as to a final category of Groups, for whom CFN also has produced old contracts with automatic renewal provisions, the record contains no other evidence revealing any meaningful communication with the Groups during the relevant time period.  Liberty will argue, perhaps less forcefully here, that a total lack of communication between CFN and its purported client over an extended period of time should cause a jury to infer termination under traditional agency principles.  Examples of these Groups include AH Belo Corp., Biolab, Inc., and Health Alliance of Greater Cincinnati.  Doc. No. 115-1 at 6, 10, 18; Doc. No. 127 at ¶ 42.

---

the use of its logo and contact with its employees.  Doc. No. 115 at ¶ 12; Doc. No. 115-1 at 5; Doc. No. 115-21 at 5-6.  Similarly, no signed contract exists as to Lenovo, and there is evidence in the record that Lenovo's predecessor, IBM (with whom CFN did have a contract), affirmatively terminated its relationship with CFN.  See Doc. No. 123-5 at 5-8 (unsigned contract); see also, e.g., Doc. No. 116-37 (regarding loss of IBM relationship).  The record does not permit the Court to resolve whether that termination extended to any relationship with Lenovo.

In sum, although Liberty has made a formidable showing as to several of the remaining fifty-three Groups, the evidence is not sufficient to justify removing the fact-laden, dispositive question under traditional principles of agency law from the realm of the jury and permit the Court to enter summary judgment insofar as these fifty-three Groups are concerned. On the record as it stands now, the Court cannot resolve, as a matter of law, at what point (if ever) inactivity, unresponsiveness, or indications that a Group's YouDecide.com website was not actively promoted by that Group's human resources department for a period of time should have reasonably caused CFN to question whether its authority to act as a Group's representative persisted. Accordingly, Liberty's motion is DENIED with respect to the breach of contract claims related to the Groups not identified in the previous two subsections. See notes 3 and 16, supra.

### 4.      *Real-Time Quoting*

Apart from the claims related to commission payments, Liberty also seeks summary judgment with respect to the portions of CFN's breach of contract claims which arise from Liberty's decision not to restore CFN's access to "real-time quoting" technology. This aspect of the breach of contract claims is more straightforward, and is more easily resolved in Liberty's favor.

The fatal flaw in CFN's position on this issue is that the contractual obligation it seeks to impose on Liberty – that Liberty provide CFN with access to an online system with "real-time quoting" capabilities – appears nowhere in the 2007 Agreement. According to CFN, the obligation arises from two particular subsections of the agreement: sections 5(a)(iii) and (iv). See Doc. No. 119 at 19; Doc. No. 121 at 20. These subsections appear under the heading "Responsibilities," and they are among a list that defines ***CFN's*** functions in its relationship with

Liberty, not any obligations Liberty owes to CFN.  Doc. No. 116-1 at 5.  The two cited

subsections describe CFN's duties to include the following: "CFN will filter incoming quote

requests to Liberty according to Liberty provided rules, at no cost to Liberty," and "CFN shall

transmit data to Liberty via insurance applications for Members that meet Liberty's underwriting

standards and guidelines."  Id.  Although CFN may have performed these functions via an online

quoting system at the time the 2007 Agreement was signed, nothing in the plain language of the

provisions requires that that such functions be performed in that manner in perpetuity.  And the

provisions certainly do not require Liberty to incur the costs associated with implementing and

maintaining an online quote system, let alone to provide CFN with access to such a system.  See

Doc. No. 116-49 at 3 (projecting it would cost $75,000 to put in place technology necessary to

provide CFN with access to one aspect of Liberty's new online quoting system).

Beyond the language of the 2007 Agreement (which, in the Court's view, is the

beginning and end of the inquiry insofar as CFN's breach of contract claim is concerned), CFN

urges the Court to find Liberty breached an obligation it owed based on "the parties' ongoing

relationship" and evidence showing that Liberty, when it was developing its new quoting

technology, intended to restore CFN's access to "real-time quoting" via the new system.  Doc.

No. 121 at 19.  However, the fact that CFN once had access to such a system, and that Liberty

contemplated restoring such access but ultimately decided not to do so, does not give rise to a

legal claim against Liberty.  The record demonstrates that development of the new system took

longer than Liberty expected, and that when the platform ultimately was ready to be shared with

brokers, Liberty made a business decision not to implement it for CFN due to the ongoing

dispute about commission payments and looming litigation.  See Doc. Nos. 116-46, 116-47, 116-

48, 116-49, 116-50 (testimony by a Liberty representative and internal Liberty emails related to

the development and implementation of the new system, including discussions of when to

provide it to brokers and whether to include CFN).

Although CFN was understandably unhappy to lose access to such technology, it has

offered nothing more than unsupported speculation to suggest Liberty's decision was motivated

by bad faith or an effort to circumvent the terms of the 2007 Agreement.  Similarly, the Court's

review of the record uncovered no evidence that would permit a reasonable factfinder to

conclude that Liberty breached the explicit or implicit terms of the 2007 Agreement by not

restoring CFN's real-time quoting capabilities.  Accordingly, Liberty's motion is ALLOWED

insofar as CFN's breach of contract claims relying on this theory are concerned.[27]

     B.    <u>CFN's Motion: Breach of Contract</u>

Besides summarily opposing Liberty's request for summary judgment,[28] CFN seeks entry

of judgment in its favor on its own breach of contract claim.  In support, it argues the

unambiguous terms of the 2007 Agreement precluded Liberty from asking CFN to "re-prove" its

designation as representative of record and from withholding commission payments upon CFN's

refusal to do so, and that industry practice prevented Liberty from "unilateral[ly] . . .

terminat[ing] CFN's representative of record status."  Doc. No. 121 at 13-17.  Liberty urges that

its decision to cease commission payments was justified in light of its reasonable concerns about

---

[27]  CFN has cross-moved for summary judgment on its breach of contract claim, citing this theory.  For the same reasons set forth in this section, CFN's cross-motion is DENIED in this respect.

[28]  <u>See</u> Doc. No. 121 at 13 n.4 (stating without elaboration that CFN "opposes Liberty's request for summary judgment on each [remaining count]"); <u>id.</u> at 17-19 (arguing Liberty is not entitled to judgment on "the allegedly inactive accounts" without citing to a single source of law or document in the record); <u>id.</u> at 20-21 (opposing Liberty's request for judgment on its counterclaims in three paragraphs wholly lacking any legal or record citations); <u>cf.</u> <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, (1st Cir. 1990) (emphasizing the burden of production faced by a party opposing a properly supported summary judgment motion, and requiring more than "colorable" or "conjectural" opposition).

CFN's status as representative of the Groups.  Doc. No. 126 at 12.  CFN's theory rests on a tortured view of the contract and does not justify denial of Liberty's motion, let alone warrant entry of judgment in CFN's favor.

First, Liberty did not – indeed, could not – terminate CFN's status as representative of record for any Group.  As discussed above, that status amounts to a form of agency, and is something which necessarily was granted by the Groups themselves (here, usually by written contract), and could be terminated only by the Groups themselves (such as via the termination letters sent by some Groups discussed above).  See Restatement (Third) of Agency § 1.01.  What Liberty did – and could – do was cease making commission payments to CFN after: 1) noting that a majority of CFN's Groups were "inactive," and were not generating the level of new business Liberty expected given the size of those Groups; 2) reasonably questioning whether such Groups, after many years of inactivity, still recognized CFN as their representative (a condition precedent to payments under the 2007 Agreement); 3) notifying CFN of its concerns and seeking some form of proof that the inactive Groups did, in fact, continue to recognize CFN as their broker; and 4) providing CFN with a reasonable amount of time to offer such proof before terminating payments.  See Doc. No. 116-21; see also Doc. Nos. 123-2, 123-15, 123-16 (testimony by three Liberty representatives involved in the internal audit regarding the basis for their decision to request proof from CFN).  Thereafter, Liberty reinstated payments, retroactively when necessary, related to any Group for which it received (from CFN or elsewhere) confirmation of CFN's continued designation.  See Doc. Nos. 116-44, 116-45.

The 2007 Agreement need not have specified that Liberty was entitled to demand such proof from CFN.  By explicitly conditioning payment of commissions on a list of factors, the agreement implicitly permitted Liberty to seek confirmation of such factors, particularly where it

had reason to doubt whether they were satisfied.[29]  For example, had Liberty learned of facts

which caused it to question whether CFN had lost a necessary license – another precondition to

payment under section 6(d)(i), Doc. No. 116-1 at 7 – it certainly could have requested from CFN

a copy of the relevant license to confirm that payments should continue.  Contrary to CFN's

suggestion, nothing in the contract would preclude Liberty from making such a request, nor did it

preclude Liberty from seeking assurances that CFN enjoyed a "continued designation" as

representative for the inactive Groups at issue here.  The fact that CFN characterizes the demand

as unprecedented does not render it contrary to the terms of the contract.[30]  See Doc. No. 121 at 2

(stating Liberty made the demand "for the first time in its corporate history").

        There is simply no evidence before the Court, nor any meaningful legal argument by

CFN, to support a finding that Liberty breached the contract by requesting documentation

reflecting CFN's status with respect to the disputed Groups.  To the contrary, there is substantial

evidence in the record demonstrating conclusively that CFN could not satisfy the conditions

precedent to payment for a significant number of Groups, see discussion § III(A)(1) and (2),

supra – and suggesting persuasively that it could not do so for at least several additional Groups,

see discussion § III(A)(3), supra.  This evidence not only supports the reasonableness of

---

[29]  This is the finding sought in Liberty's counterclaim for declaratory judgment – i.e., a
declaration that Liberty was not obligated to pay commissions to CFN where CFN could not
demonstrate its continued status as representative of record (and, thus, failed to satisfy a
precondition to payment).  See Doc. No. 37 at 14.  Accordingly, Liberty's summary judgment
motion is ALLOWED with respect to that counterclaim.

[30]  Although CFN argues the unprecedented nature of the request shows it was made in bad faith
and in violation of the 2007 Agreement, the Court notes this fact also could suggest that CFN
was unique among brokers in having so many "inactive" clients and endeavoring to continue
collecting commissions on them.  See Doc. No. 123-32 at 8 (testimony by Liberty's expert
witness that, when he worked for a broker, all clients were "active").

Liberty's perceptions and request, it demonstrates CFN was the party in breach of the 2007

Agreement.  Accordingly, CFN's cross-motion is DENIED in its entirety.

      C.      Liberty's Motion: Other Claims

      The remaining claims garnered little attention from the parties and require little

discussion here.  Liberty's motion is ALLOWED as to CFN's unjust enrichment claim, as the

Court is satisfied – and there appears to be no genuine dispute between the parties – that the

relationship between Liberty and CFN was defined by a valid contract.  See Ruiz v. Bally Total

Fitness Holding Corp., 447 F. Supp. 2d 23, 29 (D. Mass. 2006) (dismissing unjust enrichment

claim where "a valid, express contract governed" the conduct at issue).

      Liberty's motion is likewise ALLOWED as to CFN's tortious interference and Chapter

93A claims.  CFN has wholly failed to respond to Liberty's motion on these two claims, see Doc.

No. 119 at 18-21, and the Court's review of the record reveals no evidence that could support

either claim.  Testimony and argument by CFN and its employees that Liberty made its demand

for proof and/or withheld real-time quoting software in bad faith or as an intentional effort to

sabotage CFN's business amounts to, at best, "conclusory allegations, improbable inferences,

and unsupported speculation."  See Sullivan, 561 F.3d at 14.[31]

      Neither party has moved for summary judgment on Liberty's Chapter 93A counterclaim,

so it will proceed to trial.

---

[31]  Nor does the fact that certain Liberty agents may have directly solicited a handful of Groups after CFN failed to establish its continuing relationship with those Groups warrant trial of these claims.  See Doc. No. 116-4 (section 4 of 2007 Agreement states Liberty was not obligated to prevent its own agents from marketing to the Groups).

D.      <u>Motions to Strike</u>

Although not formally filed as such, the parties' submissions arguably contain two separate motions to strike items from the summary judgment record.  First, CFN challenges an affidavit submitted by a paralegal working with Liberty's counsel.  <u>E.g.</u>, Doc. No. 127 at ¶ 6; <u>see</u> Doc. No. 115.  That request is DENIED.  The affidavit at issue simply summarizes documents produced by CFN in discovery and reviewed by the affiant.  It primarily describes documents attached as exhibits to the affidavit and, in those instances, the Court has reviewed and relied upon the documents, which speak for themselves.  Insofar as the affidavit characterized other documents not provided as exhibits in the record here, the Court has not based its decision on the affiant's description of such documents.

Second, Liberty challenges an expert report submitted by CFN, which Liberty contends is "opinion testimony of an insurance broker" which is "irrelevant and inadmissible."  Doc. No. 126 at 7; <u>see</u> Doc. No. 123-31.  Liberty does not elaborate on why it believes the testimony is irrelevant or inadmissible, nor has it formally moved to preclude the expert's report or sought a <u>Daubert</u> hearing.  As such, Liberty's request is DENIED without prejudice to Liberty raising the issue in an appropriate pretrial motion.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Liberty's motion for summary judgment (Doc. No. 112) is ALLOWED in part and DENIED in part, and CFN's cross-motion for summary judgment (Doc. No. 121) is DENIED.  Specifically, Liberty's motion is allowed as to Counts III (unjust enrichment), IV (Chapter 93A), and V (tortious interference) of CFN's Amended Complaint (Doc. No. 36) and Count I (declaratory judgment) of Liberty's Amended Counterclaim (Doc. No. 37).

With respect to Counts I and II of CFN's Amended Complaint and Counts II and III of Liberty's Amended Counterclaim (breach of contract and breach of implied covenant of good faith and fair dealing), Liberty's motion is allowed: a) insofar as such claims relate to commission payments paid and/or withheld related to the thirty-three Groups discussed in sections III(A)(1) and (2), supra; b) insofar as such claims rest on an allegation that Liberty breached the contract by requesting proof from CFN that preconditions to payment were satisfied, then stopping payments when such proof was not provided; and c) insofar as such claims arise from Liberty's decision not to reinstate CFN's access to a real-time quoting system.

The case will proceed to trial on Count IV (Chapter 93A) of Liberty's counterclaim, and on Counts I and II of CFN's Amended Complaint and Counts II and III of Liberty's counterclaim insofar as commission payments for all remaining Groups are concerned.[32]  Damages will be addressed following trial.  An initial pretrial conference will be held in this matter on November 13, 2015 at 2:00 p.m. in Courtroom 13.  Counsel should be prepared to establish a firm trial date and to discuss amenability to mediation, expected duration of trial, and any other relevant matter.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[32]  The remaining Groups are: A&P, ACE USA, AH Belo Corp., American Management Association, American Management Systems, American Standard Companies, AMP, Bally Total Fitness, Bell & Howell, Biolab, Borders Group, Catholic Health Initiatives, Cincinnati Milacron, CSEBA, Clorox, Coca Cola Company, Coca Cola Enterprises, Convergsys, GE Capital, Golub Corporation, Hartford Hospital, Health Alliance of Cincinnati, Ingersoll Rand, JP Morgan Chase, Kellogg, Lenovo, Lenscrafters, Luxottica Advantages, MASCO, Modis, National Healthcare Corporation, Nestle USA, Nextel, North Carolina Baptist Hospital, Oxford Health Plans, Precision Response Corporation, Quebecor World, Randstad North America, Southeastern Companies, Staff Mark, Star MultiCare, Starwood Hotels, Tech Data, Texas A&M, The Home Depot, Thomas & Betts, Trigon BCBS, Visiting Nurses Association, Whirlpool Corporation, Williams Co., Windmere Real Estate, Wyndham International, and Zale Corporation.